Original
No. LD-2006-002

YOUNG'S CASE

Argued: September 13, 2006
Opinion Issued: November 21, 2006

*Landya B. McCafferty*, of Concord, on the brief and orally, for the professional conduct committee.

*Daschbach, Cooper, Hotchkiss & Csatari, P.A.*, of Lebanon (*Joseph F. Daschbach* on the brief and orally), for the respondent.

GALWAY, J. On February 14, 2006, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, David A. Young, be disbarred. We order the respondent disbarred.

The PCC found the following facts. On August 30, 1998, J.L. was employed by Developmental Services of Sullivan County, Inc. (DSSC) as a caregiver for DSSC's patients. While J.L. was working that evening at DSSC, a developmentally disabled patient physically and sexually assaulted her. She sued DSSC and other defendants to recover for injuries resulting from the assault. The respondent represented J.L. in her suit, and filed a writ in the superior court on September 28, 1998, alleging the following:

> Shortly after she began her shift, at 5 p.m., [J.L.] was violently raped by [a DSSC patient]. [The patient] pinned [J.L.] to a couch, and assaulted her by biting, licking and touching her on her face, breast and arms. He pulled his pants down and put his hand inside [J.L.'s] shorts. He digitally fondled her. [The patient] punched, hit and bit [J.L.], and attempted to have sexual intercourse with her by twisting her wrist and pinning her arms behind her, then by forcing his weight upon her.

The respondent also represented J.L. in related workers' compensation and whistleblower's claims. In December 1999, DSSC settled the workers' compensation claim for $85,000. DSSC disbursed the settlement to the respondent in two installments: a payment of $15,000 on December 23, 1999, and a payment of $70,000 on January 11, 2000. The respondent deposited the $15,000 disbursement into his law office operating account as "fees earned" and deposited the $70,000 disbursement into a trust account at Claremont Savings Bank (Trust Account).

As of January 12, 2000, the Trust Account carried a balance of $70,400. Of that amount, the defendant held $70,000 in trust for J.L. On January 16, the respondent disbursed $54,116.99 from the Trust Account to one of his other clients, leaving less money in the account than was owed to J.L. On January 18, the Trust Account received a deposit of $78,000. On that same day, the respondent wrote a check to J.L. for $17,300 and wrote "full settlement" on the check. Considering the $17,300 disbursement, as well as an advance given to J.L. and additional fees, the respondent still held $41,500 in trust for J.L. on January 18. As of March 13, the respondent had made no further disbursement to J.L. On that date, he transferred $40,000 from the Trust Account into two of his operating accounts, leaving a balance of $1,975.56 in the Trust Account. The respondent had one other trust account, an IOLTA account at Fleet Bank, but this account carried a total balance of only $100.94 from March 12 through March 31. On April 3, the respondent transferred $3,500 from one of his operating accounts to his Fleet IOLTA account and marked the $3,500 as a refund to J.L. for unneeded legal fees and expert witness fees, thus increasing the total money owed to her to $45,000. On April 13, the respondent transferred $30,800 from one of his operating accounts into his Fleet IOLTA account. He then wrote J.L. two checks from the Fleet IOLTA account: one for $35,000 and another for $10,000.

At approximately the same time that the respondent disbursed the $45,000 to J.L., she terminated her attorney-client relationship with the respondent. She subsequently hired David Cole and James Mulligan as co-counsel and filed a PCC complaint against the respondent. Approximately one year later, in April 2001, the respondent informed Mulligan that he intended to pursue a lien in the amount of $45,000 against J.L. Mulligan repeatedly requested documentation, such as invoices, to support the lien claim, but the respondent failed to supply such documentation. In a letter dated November 21, 2001, addressed to Mulligan, the respondent stated that he also intended to file a lawsuit against J.L. based upon "her knowing and willful participation in a fraud." The letter alleged that J.L. had fabricated the sexual nature of the assault that occurred at DSSC. The letter stated that J.L. did not tell her supervisor, Deborah Dow, her boyfriend, Chris Hohn, or multiple other people close to her about "any sexual overtones of the [patient's] attack" until she met with the respondent's former co-counsel, Kenneth Gordon. Gordon and J.L. had met privately in late September 1998, a few days before the respondent filed the writ in superior court alleging that J.L. suffered a sexual assault while working at DSSC.

In early December 2001, Mulligan filed a motion in superior court to determine the nature of the attorney's lien. The respondent filed an

objection on December 14, in which he included allegations similar to those in his November 21 letter. Paragraph five of the objection stated, "It was only after a meeting attended only by [J.L.] and Gordon did the instance of sexual abuse come to light." Paragraph six implied that Gordon and J.L. fabricated the sexual nature of the assault: "Prior to that meeting, [J.L.] had not told her good friend, Heather Bressette, Chris Hohn, her boyfriend and soon to be fiancé, Deborah Dow, and her therapist (until after her conversation with Gordon), about any instance of sexual abuse by a resident of DSSC, only physical abuse." The respondent and J.L. later settled the attorney's lien litigation. As part of this settlement, the respondent signed a sworn affidavit, which stated, in part, that the respondent never found that J.L. was not truthful.

As a result of the respondent's allegations of fraud, DSSC filed a motion in superior court to rescind its settlement with J.L. The Superior Court (*Morrill*, J.) allowed for discovery and subsequently denied DSSC's motion. In its decision, the court relied in part upon a deposition given by Dow during the litigation against DSSC in which she stated that J.L. generally described the assault soon after it occurred, and that, within three days from the time of the assault on August 30, 1998, J.L. told Dow that the patient had digitally penetrated her vagina. The trial court found that, because the respondent was aware of Dow's deposition, he knew that J.L. told Dow about the sexual nature of the assault well before the September 1998 meeting between J.L. and Gordon. The trial court also found that it was reasonable for J.L. to have not told her boyfriend or other people about the details of the assault. Accordingly, the trial court found that the respondent's allegations of fraud in the December 14 objection were misleading:

> I believe that Attorney Young's representation in paragraph 5 is either intentionally or accidentally misleading, but the suggest [*sic*] it raises is not supported by the evidence.
>
> . . . .
> ... Attorney Young's representation in paragraph 6 of his objection with respect to Deborah Dow misrepresents what he actually believed and knew to be the truth.

On March 10, 2005, the New Hampshire Supreme Court Attorney Discipline Office brought eight disciplinary charges against the respondent, alleging violations of the New Hampshire Rules of Professional Conduct (Conduct Rules) and the Supreme Court Rules. The respondent stipulated to three charges, and disciplinary counsel conceded that there was insufficient evidence to support a fourth. The first stipulated charge was failure to safeguard client property in violation of

Conduct Rule 1.15(a)(1) and Supreme Court Rule 50(2)(C). Conduct Rule 1.15(a)(1) states, in pertinent part:

> Property of clients or third persons which a lawyer is holding in the lawyer's possession in connection with a representation shall be held separate from the lawyer's own property. Funds shall be deposited in one or more clearly designated trust accounts in accordance with the provisions of the New Hampshire Supreme Court Rules.

Supreme Court Rule 50(2)(C) states: "Only those retainer fees, that are refundable if not earned, and as to which the attorney has so informed the client, shall be deposited in the trust account(s) described above. These shall not be withdrawn from the account of the attorney or firm organization until earned." The respondent stipulated that he was consistently out of trust with J.L.'s proceeds from the workers' compensation settlement. He further stipulated that he withdrew money from the Trust Account that belonged to J.L. and used that money for his own benefit and for the benefit of another client. Also, the respondent stipulated to transferring J.L.'s funds to himself prior to earning those funds and without proper authorization.

The second stipulated charge was failure to maintain proper records in violation of Conduct Rule 1.15(a)(2) and Supreme Court Rules 50(2)(A) and 50(2)(F). Conduct Rule 1.15(a)(2) states, in pertinent part:

> Records shall be maintained by the lawyer of the handling, maintenance and disposition of all funds and other property of the client at any time in the lawyer's possession from the time of receipt to the time of final distribution .... The lawyer shall maintain the minimum financial records specified in the New Hampshire Supreme Court Rules ....

Supreme Court Rule 50(2)(A) requires handling of client funds similar to that required by Conduct Rule 1.15(a)(2), and also requires that the attorney or firm maintain "a ledger or system showing all receipts and disbursements from the trust account or accounts with appropriate entries identifying the source of the receipts and the nature of the disbursement ...." Supreme Court Rule 50(2)(F) states, in pertinent part:

> Each bank account required by Rule 50 ... shall be reconciled by the lawyer or law firm on a monthly basis. Such reconciliation shall disclose (a) the balance of the account according to the bank's records; (b) the balance of the account according to the lawyer or law firm's records; (c) a detailed listing of all

differences between items (a) and (b); (d) a listing of all clients' funds in the accounts as of the reconciliation date; and (e) a detailed listing of all differences between items (b) and (d).

The respondent stipulated that, on March 13, 2000, when he transferred $40,000 from the Trust Account into two of his operating accounts, he did so because he relied upon what he called a "false surplus," meaning that he thought that he had more money in the Trust Account than he actually did. The respondent thus stipulated that he failed to properly reconcile his trust account bank statements with his ledger on a monthly basis and failed to properly maintain his trust accounting system. The stipulation, and the respondent's argument on appeal, include the respondent's assertion that his mishandling of J.L.'s money occurred for two reasons: (1) because his bookkeeper, Stacia Yonce, presented him with a false statement regarding the amount of money in the Trust Account; and (2) because he was often out of his office during the fall and winter of 1999 to 2000 due to his work on a political campaign.

The third stipulated charge was a violation of Conduct Rule 8.4(a). Rule 8.4(a) states, in pertinent part, that it is professional misconduct for a lawyer to violate the Conduct Rules. Because the respondent stipulated to violating other Conduct Rules, he also violated Rule 8.4(a).

The remaining four charges alleged violations of Conduct Rules 8.4(c), 3.3(a)(1) and 3.3(a)(3) based upon the respondent's allegations of fraud against J.L. in his November 21 letter and his December 14 objection to Mulligan's motion to determine attorney's lien. A hearing panel held a hearing on the merits of the alleged violations. One of the respondent's main arguments was that the terms "sexual overtones" and "sexual abuse" that he used in the letter and the objection were not intentionally misleading because he used those terms in a specific manner. Those phrases referred only to digital penetration, not to the general sexual nature of the assault as evidenced by conduct such as the patient pulling his pants down, touching J.L.'s breasts, or putting his hand up her shorts. This distinction should not have escaped Mulligan or the trial court, the respondent argued, because both were aware of documents and deposition testimony adduced in the DSSC litigation stating that conduct that appears sexual to the average person might not be intentionally sexual if committed by a mentally handicapped person. Intentional sexual conduct by a mentally handicapped person requires an overt act, such as penetration, the respondent argued. Accordingly, the respondent asserted that the letter and the objection questioned only whether J.L. fabricated the digital penetration aspect of her claim, and the recipients of the letter and the objection should have recognized this distinction.

Not persuaded by the respondent's argument, the hearing panel found by clear and convincing evidence that the respondent engaged in conduct involving misrepresentation and dishonesty in his November 21 letter in violation of Conduct Rule 8.4(c), which provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The hearing panel also found by clear and convincing evidence that the respondent intentionally made false statements of material fact in his December 14 objection in violation of Conduct Rules 8.4(c), 3.3(a)(1) and 3.3(a)(3). Rule 3.3(a)(1) provides that a lawyer shall not "make a false statement of material fact or law to a tribunal." Rule 3.3(a)(3) provides that a lawyer shall not "offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."

After determining the respondent's violations, the hearing panel held a sanctions hearing. At that hearing, the respondent notified the hearing panel that he intended to call Judge Morrill as a witness. Disciplinary counsel objected to Judge Morrill testifying to the merits of whether the respondent misled the court, but stated that there was no objection to Judge Morrill testifying as a character witness for the respondent. The hearing panel ruled that Judge Morrill could both testify as a character witness and testify to the specific issue of why he did not file a professional conduct complaint against the respondent. Judge Morrill subsequently testified that the alleged misrepresentations made by the respondent in his December 14 objection were "probably an exaggeration, probably careless, but I didn't find it [to] rise to the level of something I would report." After the sanctions hearing, the hearing panel recommended that the respondent be suspended for two years. The hearing panel stated that it would normally agree with disciplinary counsel's recommendation of disbarment; however, the hearing panel stated that the respondent still can make positive contributions to the Bar.

In its petition to this court, the PCC reviewed the hearing panel's reports and agreed with the findings of violations. The PCC disagreed with the hearing panel's admission of Judge Morrill's testimony, however, concluding that the testimony was inadmissible under the deliberative process privilege. The PCC also disagreed with the hearing panel's recommended sanction and petitioned this court to disbar the respondent. The PCC found that the respondent knew that the facts asserted in his November 21 letter and December 14 objection were false when he wrote them.

In response to the PCC's petition, the respondent first argues that the PCC erred when it found that there was clear and convincing evidence that

he engaged in misrepresentation in his November 21 letter and in his December 14 objection. Next, he argues that the hearing panel violated his due process rights by adding a charge against him without first giving him notice and an opportunity to be heard on that charge. Third, he argues that the PCC wrongfully excluded Judge Morrill's testimony. Finally, he argues that, even if this court sustains all factual findings made by the PCC, disbarment is not the appropriate sanction.

## I. Misrepresentations

The respondent argues that his November 21 letter did not contain misrepresentations or dishonesty in violation of Conduct Rule 8.4(c), and that his December 14 objection did not contain intentionally false statements of material fact in violation of Conduct Rules 3.3(a)(1), 3.3(a)(2), and 8.4(c). Neither the letter nor the objection were dishonest, he argues, due to the distinction between a sexual assault committed by an average person and a sexual assault committed by a mentally handicapped person. He contends that when he stated that J.L. never informed anyone, including Deborah Dow, about the "sexual overtones" and "sexual abuse" in the assault until after the meeting with Gordon, he referred only to the overtly sexual act of digital penetration. Accordingly, the respondent argues that the PCC erred in finding that these statements were misleading.

The PCC's findings of violations of the Conduct Rules must be supported by clear and convincing evidence. SUP. CT. R. 37A, III(d)(2)(C). In attorney discipline matters, we defer to the PCC's factual findings if supported by the record, but retain "ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Wolterbeek's Case*, 152 N.H. 710, 714 (2005) (quotation omitted).

The PCC found that in the November 21 letter, the respondent falsely stated that J.L. did not inform Dow of the sexual overtones of the attack until after speaking with Gordon. The PCC also found that multiple statements in the respondent's December 14 objection were false, including: (1) that the instance of sexual abuse came to light only after a meeting attended only by J.L. and Gordon; and (2) that J.L. did not tell Dow about the sexual abuse until after speaking with Gordon. The PCC found that the respondent knew that his statements in both the letter and objection were false when he wrote them.

The record supports the PCC's findings. Even if the respondent truly intended terms like "sexual overtones" and "sexual abuse" to refer only to digital penetration, the record contains Dow's testimony that J.L.

told her in early September 1998 that the patient had digitally penetrated J.L. In his order on DSSC's motion to rescind, Judge Morrill also found that J.L. told Dow about the digital penetration shortly after the incident. The record is clear that the respondent was aware of Dow's testimony when he wrote the letter and the objection, which supports the finding that the respondent knew that his statements were false when he wrote them. We conclude that the record supports the PCC's findings that the respondent violated Conduct Rules 3.3(a)(1), 3.3(a)(3) and 8.4(c) by clear and convincing evidence.

## II. Due Process

Although the hearing panel found violations based upon his misrepresentation and dishonesty, the respondent argues that the panel's true concern was its finding that he threatened J.L., and that the hearing panel gave improper weight to that finding when determining what rules he violated and what sanctions he should receive. Because the notice of charges did not charge him with threatening a former client, the respondent argues that he was given no notice that the hearing panel would consider such conduct, and, thus, he was denied due process.

We disagree with the respondent's interpretation of the hearing panel's decision. Our reading of the decision reveals that the hearing panel consistently focused upon the respondent's misrepresentations. The respondent quotes in part the hearing panel's statement that the November 21 letter "was intended by the Respondent to threaten [J.L.]," and cites this as support for his argument that the hearing panel improperly focused upon the threatening nature of the letter. The respondent fails to quote, however, the remainder of that sentence, which continues by stating, "and it did contain material misrepresentations, most notably in paragraph 3." The respondent also fails to consider other language in the hearing panel's findings and in its sanctions report that demonstrate its focus upon the respondent's misrepresentations and dishonesty. In its findings, the hearing panel stated, "We specifically find—by clear and convincing evidence—that Respondent did engage in conduct involving misrepresentation and dishonesty in his letter to James Mulligan, Esquire of November 21, 2001 .... This is a violation of Rule 8.4(c)." The hearing panel made a similar finding regarding the December 14 objection. In its sanctions report, after stating the recommended sanctions for the mismanagement of J.L.'s money, the hearing panel stated, "His other violations for dishonesty, misrepresentation and false statement are viewed as far more serious by the Panel." These statements make clear that the hearing panel based neither its findings of violations

nor its sanctions upon the uncharged conduct of threatening a former client. Thus, we find no basis for the respondent's due process argument.

## III. Exclusion of Judge Morrill's Testimony

The respondent argues that the PCC erred in ruling that Judge Morrill's testimony from the sanctions hearing was inadmissible under the deliberative process privilege because the authority to rule on the admissibility of evidence is not among the powers granted to the PCC under the Supreme Court Rules. That authority belongs instead to the hearing panel, the respondent argues, and the PCC does not have the authority to reverse the hearing panel's evidentiary rulings.

For the purposes of our sanctions review, we will assume without deciding that the PCC improperly excluded Judge Morrill's testimony. As we have the entire record before us, we will consider Judge Morrill's testimony in making our final determination of the appropriate sanction.

## IV. Sanctions

The respondent argues that disbarment is not the appropriate sanction. He suggests that an admonition or reprimand is the appropriate sanction for his violations.

As stated above, we retain "the ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Wolterbeek's Case*, 152 N.H. at 714 (quotation omitted). In determining a sanction, we are mindful that the purpose of attorney discipline is not to inflict punishment, but rather "to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Richmond's Case*, 152 N.H. 155, 159-60 (2005). We judge each attorney discipline case on its own facts and circumstances, taking into account the severity of the misconduct and any mitigating circumstances appearing in the record. *Id.* at 160. "The gravity of unprofessional conduct is not determined solely by the number of rules broken or by the particular rules violated, but is determined largely with reference to the attorney's behavior." *Morgan's Case*, 143 N.H. 475, 477 (1999).

Although we have not adopted the ABA's STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (STANDARDS), we look to them for guidance. *Wolterbeek's Case*, 152 N.H. at 714. The STANDARDS list the following factors for consideration in imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. STANDARDS, *supra* § 3.0; *Wolterbeek's Case*, 152 N.H. at 714. In

applying these factors, the first step is to categorize the respondent's misconduct and identify the appropriate sanction. *Wolterbeek's Case,* 152 N.H. at 714. We then consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Richmond's Case,* 152 N.H. at 160-61.

The respondent's misconduct falls into two main categories: his failure to safeguard his client's property and maintain proper financial records, and his intentional misrepresentations. We begin by considering the intentional misrepresentations and false statements of material fact that the respondent made in the November 21 letter and the December 14 objection. As stated above, the record supports the PCC's finding that the respondent violated Conduct Rules 3.3(a)(1), 3.3(a)(3) and 8.4(c). The STANDARDS state that "[d]isbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement . . . and causes serious or potentially serious injury to a party . . . ." STANDARDS, *supra* § 6.11. The STANDARDS state that "[s]uspension is appropriate when a lawyer has not acted with intent to deceive the court . . . ." *Id.* § 6.12. The record supports the PCC's findings that the respondent intended to deceive the court in this case; thus, suspension is not appropriate under the STANDARDS. The respondent's misleading statements also caused significant potential injury to his client, as his statements in the objection sparked a motion to rescind settlement by the DSSC. The false statements thus placed J.L.'s $85,000 settlement award at risk, and fall within the type of conduct for which the STANDARDS recommend disbarment. As we have had to state too often, "The privilege of practicing law does not come without the concomitant responsibility of truth, candor and honesty. Because no single transgression reflects more negatively on the legal profession than a lie, attorney misconduct involving dishonesty justifies disbarment." *Cohen's Case,* 143 N.H. 169, 172 (1998) (ellipses and brackets omitted). We note that the sanction of disbarment in this case is in accord with our prior decisions. *See, e.g., Basbanes' Case,* 141 N.H. 1, 6-7 (1996) (disbarring a lawyer for intentionally misleading a marital master regarding the settlement in a related case).

We next consider the effect of mitigating or aggravating factors with respect to this sanction. The PCC found no mitigating factors related to this sanction. As for aggravating factors, prior disciplinary offenses constitute an aggravating factor. *Wolterbeek's Case,* 152 N.H. at 716. The respondent has received three prior reprimands from the PCC. Multiple offenses are another aggravating factor. *Id.* at 717. In the instant case, the respondent has violated Conduct Rules 1.15(a)(1), 1.15(a)(2), 3.3(a)(1), 3.3(a)(3), 8.4(a) and 8.4(c), and Supreme Court Rules 50(2)(A), 50(2)(C) and 50(2)(F). In the case of multiple charges of misconduct, the ABA recommends that the sanction imposed "should at least be consistent with

the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct." AMERICAN BAR ASSOCIATION, COMPENDIUM OF PROFESSIONAL RESPONSIBILITY RULES AND STANDARDS 341 (1999 ed.); *see Richmond's Case*, 152 N.H. at 160. Additionally, the PCC found that the respondent "showed no remorse at any time."

▪ Considering the above facts, the findings by both the hearing panel and the PCC, the arguments made by both parties, and the aggravating factors, we order the respondent disbarred based upon his violations of Conduct Rules 3.3(a)(1), 3.3(a)(3) and 8.4(c). This sanction satisfies the goals of the attorney discipline system by protecting the public and preserving the integrity of the legal profession. We further order the respondent to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. SUP. CT. R. 37(19). In light of our ruling, we need not determine what the appropriate sanction would be for the respondent's failure to safeguard his client's property and maintain proper financial records.

*So ordered.*

BRODERICK, C.J., and DUGGAN, J., concurred.