Professional Conduct Committee
No. LD-2009-006

## MORSE'S CASE

Argued: March 31, 2010
Opinion Issued: July 20, 2010

*Landya B. McCafferty*, of Concord, on the brief and orally, for the professional conduct committee.

*Lynn D. Morse, pro se*, filed no brief.

DUGGAN, J. On September 14, 2009, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, Lynn D. Morse, be suspended from the practice of law for two years. We order that the respondent be disbarred.

*I. Facts*

Morse has stipulated to, and we accept, the following facts. *See Conner's Case*, 158 N.H. 299, 300 (2009); SUP. CT. R. 37A(III)(c)(5). Morse, an attorney licensed in New Hampshire since 1972, represented Bertha McInnes in a guardianship action. On September 12, 1998, McInnes died. Her estate was valued at $461,500. In her will, McInnes named her niece, Ruth Ann Mize, as executrix. Mize resides in California.

On September 22, 1998, Morse filed an appearance on behalf of Mize and a petition for estate administration in the Rockingham County Probate Court. The court approved both the petition and a bond in the amount of $350,000. On November 25, 1998, the court ordered Morse to file an estate inventory by February 21, 1999, and an accounting by November 24, 1999. The court required Morse to file a yearly accounting until he completed a final accounting for the estate.

*A. The Inventory*

Morse failed to file the inventory by the court's deadline. He filed four petitions to extend the deadline, alleging each time that he could not complete the inventory "until the final account in the Guardianship of Bertha McInnes . . . has been completed and [Mize] receives the guardianship Estate." The court granted these petitions. Finally, in September 1999, approximately seven months after the first deadline, Morse filed the inventory.

*B. The First Accounting*

Morse also failed to file the first accounting by November 24, 1999. On February 23, 2000, the court placed the case in default, assessed a $25.00

default fee, and warned Mize that the court would issue a citation if she failed to file the accounting within thirty days. Morse filed two petitions to extend the deadline, claiming that "[t]his is a complex Estate with a number of personal property assets that have been sold or transferred" and that he needed "additional time to complete" the first accounting. The court granted these petitions. Finally, on June 23, 2000, approximately seven months after the deadline, Morse filed the first accounting and a petition to make interim distributions to the three residuary legatees.

## C. The Second Accounting

The second accounting was due on November 24, 2000. Morse failed to meet this deadline, and, over a period of more than two years, filed twelve petitions to extend the deadline. At various times, Morse claimed that: (1) the estate was "complex . . . with a number of assets" so he needed additional time to complete tax returns for the estate; (2) "[t]he Estate has recently learned that it owns certain shares of Avaya, Inc., common stock" that must be sold before the final accounting; and (3) "[t]here is one antique item in the possession of Skinner, Inc. which is awaiting sale at auction." Morse also claimed that he had prepared the second accounting for Mize's signature.

The court granted most of the petitions. The court cited Mize for her failure to timely file the second accounting, but did not issue a finding of contempt on the condition that she file the accounting no later than May 1, 2002. On November 25, 2002, the court granted Morse's eleventh petition to extend the deadline but prohibited any further extensions. By order dated February 10, 2003, the court notified Mize that Morse had failed to file the second accounting, and scheduled a hearing for April 7, 2003, requiring Mize to personally appear and explain why she had failed to file the second accounting. The court later continued the hearing to April 21, 2003. Four days later, the court issued an order stating that, based upon Morse's "assurance that he will file a final account **no later than May 23, 2003,** no finding is entered nor sanction is presently imposed. . . . *No further postponements shall issue.*"

Mize wrote a letter to the court, dated May 21, 2003, stating, in relevant part:

> Morse assured me that he would handle the details to settle the Estate.
>
> It has been 5 long years of numerous phone calls and letters trying to settle these matters. [Morse] never returns my calls,

making it necessary for me to make numerous calls until he is in and available. . . . It seems to me that 5 years is much too long for an Estate to be settled.

When I received your order . . . I was embarrassed and angry. The three recipients of the bulk of the Estate are in the later years of their lives, 84, 90, and 91. They have looked to me to see that my aunt's will would be carried out. . . .

I called [Morse] as soon as I got your notice. He assured me that he would have everything wrapped up by the deadline you have set. He also told me that he would be sending me papers that I needed to sign. On Monday of this week, I called his office to see why I hadn't received anything. He said he hadn't gotten it finished and promised to overnight the papers to me, to arrive at my home on Wednesday, May 21st. The papers never arrived.

It is my understanding that he is to meet with you on Friday, May 23rd. I am sending you this letter, overnight, in the hopes that you will receive this before you meet with [Morse].

Please advise me what I need to do to finish this long process and make the final payments to those entitled.

Mize also wrote an undated letter to Morse, which stated, in relevant part:

[B]oth my husband and I have tried repeatedly over the past four months to reach you by phone, to no avail. We have left messages asking that you return our calls and while all of the numbers that you can reach us at have answering services if we are busy or away, we have had no response to any of our messages.

When I spoke with you last, you told me that you would be filing the final taxes on the McInnes Estate the following Monday. . . .

I realize there have been some circumstances that have slowed down the process of settling this Estate, including your losing your receptionist. However, I have made you aware of my concern that one uncle who was to receive an inheritance from this Estate has already passed away and the three women remaining who benefit from this Estate, are of advanced age. . . .

By this letter and a copy being sent to the Rockingham Probate Court, I am requesting that I be completely informed of the status

of this file immediately. If the taxes have not been filed, please explain why they haven't. If they have been filed, when were they filed and has the State approved the filing? What, if anything, is preventing the final closure of this Estate? . . .

I am expecting to hear from you immediately, upon receipt of this letter.

Morse failed to file the accounting by May 23, 2003, and, on June 12, 2003, the court ordered Mize to personally appear at a hearing to "show cause why he/she should not be held in contempt of court and punished accordingly for the failure and neglect to comply with" the court's order.

Morse sent a proposed second accounting to Mize. He sent a copy to the court on June 23, 2003, and expressed his belief that Mize would send the signed original to the court. Morse paid a $50.00 citation fee, and anticipated that, based upon his submissions, the court would not hold a hearing, and left on a vacation. However, contrary to Morse's expectations, Mize appeared at the June 23 hearing. The court issued an order the day after the hearing, which stated, in relevant part:

> Mize reported that her non-compliance with the April 25, 2003 order . . . is the result of her attorney's failure to discharge his duties to her. She has attempted to contact him to secure answers to questions that she would like to have clarified before she executes documentation that he has prepared and forwarded to her. The questions she detailed to the court seemed reasonable. The court does not apprehend why her attorney has not reasonably responded. . . . [Morse previously] took responsibility for the delayed administration and gave assurance that he would be able to readily comply with the May 23, 2003 deadline for a *final* account.

The court ordered Mize to submit a final account no later than July 31, 2003. Mize terminated Morse and hired Attorney Charles F. Tucker to represent the estate. On July 18, Attorney Tucker filed a motion to accept interim accounting and for an extension of time to finalize the estate, enclosing the second accounting prepared by Morse; both requests were granted by the court. Shortly thereafter, Mize retained Attorney Andrea L. Sennott, of Robinson, Boesch, Sennott & Aeschliman, P.A., to represent the estate.

### D. Tax Returns

In the proposed second accounting that Morse submitted to the court, he indicated that he had filed all federal and state income tax returns for the

last year of McInnes's life and for her estate. Morse also informed Mize that he had filed tax returns and that the estate could expect to receive a significant tax refund. In a letter to the court, Morse stated that the Estate was "awaiting refunds from the Internal Revenue Service." As an addendum to this account, Morse attached his legal bill for the first account; a time entry in the bill, dated April 15, 1999, stated "Prepare 1998 Fm 1040," and indicated that he spent 1.5 hours on this return, at a rate of $120 per hour.

After Mize terminated him, Morse failed to disclose that he had not filed the tax returns. In a letter to the estate's legatees, Tucker's paralegal wrote that Morse "is still awaiting tax refunds from the Internal Revenue Service and from the State of New Hampshire, which he estimates may be in excess of $15,000.00." Morse submitted a legal bill to the estate for the second accounting in which he stated that he prepared state and federal taxes for the estate. However, the estate file from Morse contained no executed tax returns.

Attorney Sennott filed a final accounting for the estate on October 30, 2003. Attorney William S. Boesch, also of Robinson, Boesch, Sennott & Aeschliman, contacted the Internal Revenue Service (IRS) and was informed that no tax returns had been filed for McInnes or the estate. After receiving the necessary tax returns from Attorney Boesch, the IRS declined to issue a $579 refund for McInnes's personal tax return because it was filed too late. The IRS assessed the estate penalties and late interest for tax years 1999, 2000, and 2001. Attorney Boesch finally resolved the outstanding tax issues with the IRS in August 2004.

### E. The File Transfer

After June 23, 2003, Morse agreed to transfer the file for the estate to Mize's new attorney. On October 3, after making repeated requests, and receiving assurances from Morse that he would transfer the file, Sennott's paralegal sent an email to Mize in which she stated, in part:

> It is with much regret that I have to inform you that . . . [Morse] still hasn't gotten the file to us. I've tried daily. I've made appointments with him to pick it up and he calls and cancels at the last minute because he's out of paper, the copier isn't working, or one excuse after another.

Three days later, Morse transferred the file.

In a letter to Morse dated September 5, 2003, the New Hampshire Department of Revenue Administration (DRA) asked for additional information to process a tax return it had received for the McInnes estate.

Subsequently, Morse received another letter from the DRA informing him that, because he had failed to send the requested documentation, it made an audit adjustment based on its file. Although the letter stated that Morse had until November 17 to voice his disagreement with the adjustment, Morse failed to respond or to notify successor counsel of the letter.

The estate was closed in March 2004, and, as a result of Morse's failure to adequately close out the estate, it incurred approximately $8,000 in legal fees to successor counsel, in addition to fees paid to Morse.

## II. Procedural History

Mize filed a complaint against Morse with the Attorney Discipline Office. Disciplinary counsel filed charges against Morse, alleging that he failed to complete the estate administration and provide a copy of the estate file to successor counsel in a timely fashion, and made false assertions to the court with respect to the estate's tax returns. A Hearing Panel was appointed on May 15, 2008. Although Morse initially claimed that he had prepared the returns for Mize's signature and that he "retained copies for [his] file," at the hearing before the Panel, he disclosed for the first time a set of unfiled tax returns for the estate that contained handwritten entries. He explained at the hearing that he would have filed the tax returns had Mize not terminated him. At the hearing, disciplinary counsel argued that the Hearing Panel should disbar Morse.

The Hearing Panel recommended that Morse be suspended for two years from the practice of law, with conditions for reinstatement. It concluded that he violated the following New Hampshire Rules of Professional Conduct: 1.1 (Competence); 1.3 (Diligence); 1.16(d) (Return of the File); 3.3(a)(1) (Candor to the Tribunal); and 8.4(c) (Dishonesty). The Hearing Panel determined that the violations of Rules 3.3(a)(1) and 8.4(c) were the most serious. The Hearing Panel concluded that "suspension was the baseline sanction in this case," relying upon Section 6.12 of the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (hereafter STANDARDS).

The Hearing Panel found the following aggravating factors: (1) a prior disciplinary offense, which "bore marked similarities to the violations in this case," and for which Morse was disciplined while representing the estate in this case; (2) that Morse submitted false evidence and statements, and committed other deceptive practices during the disciplinary process; (3) that he refused to acknowledge the wrongful nature of his conduct; (4) that Mize and the legatees were vulnerable because they were "elderly and/or infirm and in need of the assets from the estate"; (5) that Morse had substantial experience in the practice of law; and (6) that he was indifferent

to making restitution. The Hearing Panel determined that the following were mitigating factors: (1) that Morse lacked a selfish motive; (2) that he had a good reputation "in his community and by people who have worked for him;" and (3) that he showed "remorse and regret for his professional failings."

Disciplinary counsel requested oral argument before the PCC on the sanction, and argued that Morse should be disbarred. The PCC, however, recommended a two-year suspension from the practice of law with conditions for reinstatement. The PCC determined that Morse "violated duties to his client, the court and his profession[,]. . . misrepresented the status of his client's case to the client and the court, and did not cooperate promptly with subsequent counsel." The PCC found that while Morse was grossly negligent, "there is no evidence that he acted with any intent to do harm to anyone or with any intent to benefit himself." Although the PCC concluded that Morse caused emotional and financial injuries to his client, it determined that those injuries "did not rise to the level of 'serious' injury as described in the [STANDARDS]." Accordingly, relying upon section 6.12 of the STANDARDS, the PCC determined that the baseline sanction for Morse was suspension. After considering the aggravating and mitigating factors relied upon by the Hearing Panel, the PCC "found an insufficient basis for elevating the sanction to disbarment" because: (1) Morse did not act with a selfish motive; (2) there was no "pattern of misconduct"; (3) Morse has a positive reputation in the community and has practiced law for over thirty years; and (4) after considering "other cases in which similar circumstances were presented . . . [the PCC] found no basis for inconsistently imposing . . . disbarment."

Disciplinary counsel moved to reconsider, arguing that the PCC "misapprehended . . . critical legal principles" and that, in light of those principles, disbarment was the appropriate sanction. The PCC granted that motion, but voted to reaffirm its previous decision.

*III. Analysis*

■ We retain the ultimate authority to determine the sanction for a violation of the rules governing attorney conduct. *Conner's Case*, 158 N.H. at 303. When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future. *Id.* We consider the case on its own facts and circumstances in deciding the sanction. *Id.* The sanction we impose must take into account the severity of the misconduct. *Coffey's Case*, 152 N.H. 503, 513 (2005).

■ We look to the STANDARDS for guidance. *See Douglas' Case*, 156 N.H. 613, 621 (2007). Under the STANDARDS, we consider the following factors when imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *Conner's Case*, 158 N.H. at 303; STANDARDS, *supra* § 3.0. We first categorize the respondent's misconduct and identify the baseline sanction. *Conner's Case*, 158 N.H. at 303. After determining the sanction, we then consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Id.* Where there are multiple misconduct charges, "the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct." *Wyatt's Case*, 159 N.H. 285, 306 (2009) (quotation omitted).

We first review the duties that Morse violated. According to the PCC, the misrepresentations to the court and to Mize with respect to the tax returns were the most serious violations. We agree.

■ Next, we consider Morse's mental state at the time of his violations, which may be one of intent, knowledge, or negligence. *Grew's Case*, 156 N.H. 361, 366 (2007). The volitional nature of the acts, and not the external pressures that could potentially have hindered his judgment, is relevant. *Wyatt's Case*, 159 N.H. at 307. The PCC concluded that Morse acted with gross negligence. We disagree.

■■ The STANDARDS define negligence as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." STANDARDS, *supra* at 9. By contrast, "[i]ntent is the conscious objective or purpose to accomplish a particular result," and "[k]nowledge is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." STANDARDS, *supra* at 9 (quotation omitted). Here, Morse admitted that, when he submitted the second accounting to the court and to Mize, he knew that he had not filed the tax returns. Although, as the PCC concluded, Morse may not have acted with an intent to harm anyone or to benefit himself, we conclude that he acted intentionally when he made these false statements. *See Conner's Case*, 158 N.H. at 304.

■■ We next consider the actual or potential injury flowing from Morse's conduct. The STANDARDS define injury as "harm to a client, the public, the legal system, or the profession which results from a lawyer's

misconduct." *Id.* "The level of injury can range from 'serious' injury to 'little or no' injury." STANDARDS, *supra* at 9. Although the PCC acknowledged that Morse's actions caused emotional and financial injuries to his client, it determined that those injuries "did not rise to the level of 'serious' injury as described in the STANDARDS." We disagree. At a minimum, Morse's misconduct caused substantial harm to Mize, the estate, and its legatees. The estate paid approximately $8,000 in legal fees to successor counsel, in addition to fees paid to Morse for his incomplete work with respect to the tax returns. The IRS declined to issue a $579 refund because the tax return for the last year of McInnes's life was filed more than three years late, and assessed penalties and interest for tax years 1999, 2000, and 2001. The estate paid $1,849.68 for Mize to appear in person on June 23, 2003, because of Morse's failure to file the second accounting on time. In fact, Mize made "several trips to the east coast[ ] specifically for this matter" and stated that she suffered emotional stress as a result of Morse's misconduct. Because both Mize and the legatees were elderly, the length of time it took to close the estate was particularly harmful. Finally, Morse's lies to the tribunal and to Mize caused great harm to the court, his client, and to the profession; as we have stated, "no single transgression reflects more negatively on the legal profession than a lie." *Young's Case*, 154 N.H. 359, 369 (2006). For these reasons, we conclude that Morse's actions caused serious injury.

Sections 6.11 and 6.12 of the STANDARDS provide that:

> Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Morse caused serious injury to Mize, the estate, and its legatees. *See Conner's Case*, 158 N.H. at 304. He lied to his client and to the tribunal. As officers of the court, attorneys are prohibited from making false statements of material fact to a tribunal. *See* N.H. R. PROF. CONDUCT 3.3(a)(1). "The confidence of judges to rely with certainty upon the word of attorneys

forms the very bedrock of our judicial system." *Kalil's Case*, 146 N.H. 466, 467 (2001) (quotation omitted). We conclude that the baseline sanction is disbarment.

Finally, we consider the aggravating and mitigating factors. The PCC found the following aggravating factors: (1) Morse's prior, similar disciplinary offense; (2) his submission of false evidence and statements and deceptive practices during the disciplinary process; (3) his refusal to acknowledge the wrongful nature of his conduct; (4) the vulnerability of Mize and the legatees; (5) Morse's substantial legal experience; and (6) his indifference to making restitution. *See* STANDARDS, *supra* § 9.22 (a), (e)-(j). We agree that these aggravating factors apply. As mitigating factors, the PCC found that Morse: (1) lacked a selfish motive; (2) had a good reputation in the community and among his employees; and (3) showed remorse and regret. *See* STANDARDS, *supra* § 9.32 (b), (g), (l). We also agree that these mitigating factors apply.

However, we conclude that Morse's deliberate lies require no less a sanction than disbarment. *See Young's Case*, 154 N.H. at 369 (stating that "attorney misconduct involving dishonesty justifies disbarment"). "The privilege of practicing law does not come without the concomitant responsibilities of truth, candor and honesty. Lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity." *Bosse's Case*, 155 N.H. 128, 131 (2007) (citation and quotation omitted). Having considered both the aggravating and mitigating factors, we conclude that the sanction of suspension would be "insufficient to protect the public and preserve the integrity of the legal profession." *Wyatt's Case*, 159 N.H. at 309. Moreover, disbarment has been imposed for similar misconduct. *See, e.g., Basbanes' Case*, 141 N.H. 1, 8 (1996).

Based upon the above, we find that disbarment is the appropriate sanction, and order the respondent to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. SUP. CT. R. 37 (19).

*So ordered.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.