Original
No. LD-2009-002

## WYATT'S CASE

Argued: June 16, 2009
Opinion Issued: September 18, 2009

*James L. Kruse*, assistant disciplinary counsel, of Concord, on the brief and orally, for the professional conduct committee.

*Donald L. Wyatt, Jr.*, on the brief and orally, *pro se*.

HICKS, J. On February 10, 2009, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, Donald L. Wyatt, Jr., be disbarred. *See* SUP. CT. R. 37A(III)(d)(2)(C)(iv). We order the respondent suspended for a period of two years.

The respondent has stipulated to, and we accept, the following underlying facts. *See Conner's Case*, 158 N.H. 299, 300 (2009); SUP. CT. R. 37A(III)(c)(5). The respondent is an attorney licensed to practice in New Hampshire. Beginning in the spring of 1998, he served as personal counsel to David Stacy. David was a full-time employee of his mother and held her general power of attorney. The respondent advised David on a variety of personal matters, including his "relations with trustees of trusts previously established for his benefit." The respondent's firm prepared a general power of attorney in 2000 authorizing Michel Brault to manage David's affairs. Brault was a personal friend of the respondent and the chief executive officer of a former corporate client of the respondent's firm.

In January 2001, David's mother "dismissed" him and cut off his support. The respondent represented David in negotiations with his mother in an effort to secure financial support. The negotiations culminated in a contract between David and his mother in May 2001, in which they agreed to execute and exchange mutual general releases. Other contract provisions included an agreement for management of David's healthcare, a sale and lease back of David's home, and the creation and eventual funding of various trusts. The contract required that David file a petition for voluntary

conservatorship in New Hampshire requesting that Brault act as his conservator. The contract, by its terms, terminated if, among other things, David terminated the conservatorship or removed the conservator without cause.

The respondent, Brault and David reviewed the contract and related documents at a meeting in Paris, France. The respondent discussed David's litigation options against his mother and his option to forego his mother's support. The respondent also explained conservatorship, its voluntary nature, and "how it separated [David's] affairs into two distinct parts, an estate portion and a personal portion, and how he could end that separation by asserting that he had capacity and that he wanted to take back control of his affairs." The respondent cautioned David that taking back control, however, could effectively discharge his mother's contractual obligations to him. David ultimately decided to sign the contract and execute related documents, including the petition for conservator.

During and shortly after their Paris discussion, David expressed his desire that the respondent continue to serve as his personal attorney. David informed Brault that he also wanted the respondent to serve as counsel for the conservatorship estate. The respondent advised David that the conservator would "determine if and when [the respondent] would serve as counsel." The respondent did not, at this point, discuss conflicts of interest. At one point, the respondent had "[a] lengthy discussion . . . about the potential for disagreements and discord between [David and Brault]." The respondent was confident that David "understood that Mr. Brault would be managing his affairs and that in the event of disagreement between the two, Mr. Brault . . . would have the last word."

The Carroll County Probate Court granted David's petition for conservator in June 2001, and, as requested, appointed Brault as conservator. Brault then retained the respondent to represent the "Estate of David E. Stacy." To the extent authorized by Brault, the respondent continued to "interact directly with [David] on matters involving his personal, as opposed to his estate, rights." The respondent advised Brault on the operation of the conservatorship, including whether Brault should or could expend funds for certain expenses, and whether Brault could buy a new or second home for David. The respondent consistently advised Brault that he could not make personal choices for David, but must choose "what to contract . . . and . . . pay for." In an attempt to minimize David's legal fees, Brault informed David in the fall of 2001 that he must thereafter seek permission before consulting with the respondent about any new legal matters.

The respondent learned in the fall of 2001 that Brault was not attending to some details of his duties as conservator. He also learned that David,

with his wife Svetlana's help, "was contacting creditors, opening new credit cards and accounts, contacting insurance agents, realtors, and various other vendors in an apparent attempt to avoid the limitations of the Conservatorship." The respondent suggested that Brault get assistance with administrative tasks and advised him that he had authority to engage such professionals. The respondent recommended an accounting firm and offered his paralegal to provide administrative support at a fixed rate.

The respondent continued representing the estate in "performing and perfecting [David's] rights under the contracts with [his mother] and with other creditors and third parties." He also represented David with respect to certain personal matters, such as preparing a will, a health care power of attorney, child support for a matter predating the conservatorship, and other debtor/creditor claims against David.

During the winter of 2001, Brault sought the respondent's advice concerning whether to fund what he considered questionable medical expenses. David had been referred to a doctor in Texas for severe abdominal pain. He wanted the conservatorship to pay for his wife and daughter to travel and stay in Texas for an extended period of time. The respondent acted as an intermediary because the issue involved both personal rights and financial issues. He filed a motion for instructions with the probate court seeking court approval to set up a debit card account for certain miscellaneous expenses. The court granted the motion in February 2002.

David underwent abdominal surgery on March 1. At some point, he expressed to the respondent his dissatisfaction with the medical staff and doctors and threatened to check himself out of the hospital. Svetlana informed Brault and the respondent that David had a history of self-destructive behaviors, demands for unwarranted treatment, abuse of drugs and alcohol, threats of suicide, and abuse of both her and her daughter. The respondent made clear to Svetlana that he would not represent her regarding the domestic violence issues and referred her to another attorney. However, he remained concerned about David's mental health in view of these and other observations, including an incident where the respondent came to David's house and observed him opening two surgical wounds.

The respondent researched ethical and guardianship issues, contacted peers, and had a law clerk prepare a memorandum. He ultimately advised Brault and Svetlana to consider obtaining a limited guardianship for medical purposes only. The respondent advised them to hire their own counsel. The respondent advised them that, as David's counsel, he would be required to appear at the guardianship proceeding, would object for the record, but if the guardianship were narrow, he would support the action.

The respondent never informed David that he was recommending an attorney for Svetlana. He also never discussed the guardianship with David.

Brault and Svetlana hired Attorney Thomas Walker to initiate guardianship proceedings in the Carroll County Probate Court. Attorney Walker attached to the petition supporting affidavits prepared by the respondent and signed by Svetlana and Brault. Even after Brault and Svetlana engaged separate counsel, the respondent continued to provide legal services to Brault and Svetlana in the pursuit of a guardianship. The respondent billed the conservatorship for these legal services.

The Carroll County Probate Court held a hearing on the guardianship petition on March 26, 2002. When asked by the probate court if he represented David, the respondent informed the court that he had yet to speak with David, that he presumed David would object to the proceeding, and that such objection would conflict him out of the case. He agreed to notify David of any orders, to advise him, and then allow him to give instructions. The court offered to appoint other counsel for David, but the respondent thought it best for him to at least advise David of the proceedings given his "ongoing relationship with the conservatorship estate." The respondent agreed to call the register as soon as he obtained David's instructions regarding the guardianship proceedings. The court then appointed Brault and Svetlana temporary co-guardians over David's person, and authorized the respondent to effect service upon David and confer with him.

After researching Texas law regarding domestication of the New Hampshire order and representation of an impaired client, the respondent traveled to Texas with Brault and Svetlana. They met with doctors, social workers and administrators the next day. Dr. Charles Brunicardi informed them that surgery had not revealed any condition that would explain David's reports of pain, that David had intentionally harmed himself the night before leaving him in grave condition, and that they were obtaining a psychiatric diagnosis. The respondent was prohibited from speaking with David due to his condition.

The respondent called the register of probate and informed her that he was denied access to David for medical reasons and could not effect service of the temporary guardianship order. He then met with, and Brault engaged, Sharon Gardner, a local attorney in Texas, to make service and to advise Svetlana and Brault. Attorney Gardner ultimately concluded that domestication of the order was unnecessary and it was decided to have David served when medically possible.

After Brault, Svetlana and the respondent returned to New Hampshire, David repeatedly contacted them from Texas. On April 2, David asked the

respondent why the three had been to Texas and whether he was representing Svetlana and Brault against him. The record suggests that a doctor informed David that the respondent had traveled to Texas with Brault and Svetlana. The respondent replied: "no, of course not, that [a separate Texas attorney] was representing them."

Attorney Gardner effected service upon David on April 3. The respondent recalls advising David at or shortly after service that he would not be able to represent David in the New Hampshire guardianship case and that he should retain new counsel. The respondent forwarded the return of service to the probate court on April 10. The respondent did not clarify in the accompanying letter his status as David's personal counsel or whether David opposed the guardianship. The respondent claims to have written the probate court on April 9 to confirm David's need for independent New Hampshire counsel, but there is no written documentation of this communication. The respondent further recalls a chambers conference in May 2002 at which he apprised the court of David's opposition to the guardianship and his need for counsel, but there is no official record of this conference.

Subsequently, Brault contacted Dr. Robert Fisher in Texas to arrange a meeting with him, Svetlana and the respondent. Upon their arrival, the hospital counsel informed the respondent and Svetlana that the hospital was unwilling to communicate further with them unless they obtained a Texas court order.

Dr. Fisher met with Brault. He informed Brault, who later informed the respondent, that David remained in serious condition and that a psychiatrist evaluated David and confirmed the suspicion of a psychiatric disorder. The respondent did not notify David of these meetings and David was not represented by independent counsel.

The respondent then became convinced that David was disabled. He discussed with Brault and Svetlana the need to domesticate the New Hampshire order. In mid-April 2002, the respondent contacted Attorney A. Rodman Johnson. Svetlana and Brault retained Attorney Johnson as local counsel to represent them in connection with the guardianship matter. The respondent then undertook with Attorney Johnson to have the New Hampshire temporary guardianship order domesticated. The clerk of court for the Harris County Probate Court, however, rejected the petition without presenting it to the court because of procedural defects.

After Svetlana and Brault retained Attorney Johnson, the respondent continued to provide legal services to Svetlana and Brault in pursuit of the guardianship over David's person and to bill the conservatorship. The respondent met with Attorney Johnson on April 21 and drafted documents and pleadings to file in the Harris County Probate Court on behalf of

Brault. They jointly prepared and filed on April 22 an application for appointment of temporary guardian over the person seeking a limited guardianship for David's medical care. Attorney Johnson signed the application along with the respondent, *pro hac vice*, on behalf of Brault as conservator and co-guardian.

The Harris County Probate Court issued an initial emergency order on April 23 appointing Brault temporary guardian over the person until June 21. The court also appointed Robert MacIntyre as David's attorney. Attorney MacIntyre met with the respondent and Brault, obtained records, and discussed the conservatorship and his compensation. The respondent indicated that Brault would seek assistance from David's mother and other trustees in order to secure funding. Attorney MacIntyre met with David on April 24. From this point, David was represented in connection with the guardianship by attorneys other than the respondent; in fact, David informed Attorney MacIntyre that he was unhappy with and no longer wanted the respondent to represent him.

On May 24, the respondent prepared and filed a petition for guardian of an incapacitated person in New Hampshire and requested that Brault be appointed guardian. The respondent indicated that David would need appointed counsel. In a verified motion to extend the temporary orders, the respondent apprised the court of David's medical problems in Texas and the unsuccessful effort to domesticate the New Hampshire guardianship order. There was no reference to the guardianship proceeding in Texas or David's objection thereto. The respondent never discussed with David or Attorney MacIntyre, David's Texas counsel, whether there could be a conflict of interest associated with representing Brault in the New Hampshire guardianship proceeding.

The Harris County Probate Court conducted a hearing on June 12 to consider the temporary and permanent guardianship issues. Deborah Stacy, David's biological sister, filed an application to be appointed guardian over David's person. The respondent had never before heard from or met Deborah, and David previously told him that she was estranged. Deborah appeared at the June 12 hearing with her attorney, James Wyckoff. Attorney MacIntyre appeared on David's behalf along with Attorney Hutchison, David's guardian *ad litem*. Brault attended and was represented by Attorney Johnson and the respondent.

Attorney MacIntyre moved to disqualify the respondent as counsel for Brault, citing a conflict of interest. Attorney Johnson, on behalf of the respondent, argued that the respondent had appeared on previous pleadings, that other counsel knew he was lead counsel, and that he was acting in response to an ethical duty to protect David. The respondent argued that in May 2001 he discontinued representing David personally and was now

engaged only by the conservator to represent the conservatorship estate. He acknowledged that he had access to a large amount of privileged and confidential information, but assured the court he had not previously represented David with respect to "any matter involving his personal liberty or his medical care." The court declined to sign an order of disqualification until a proposed order was presented, but denied the motion to allow the respondent to appear *pro hac vice* in the case. The court granted Attorney Johnson's request to permit the respondent to remain at counsel table. The respondent continued to serve as counsel to Brault and the conservatorship.

Dr. Scarano testified at the June 12 hearing, recommending appointment of a temporary guardian to make David's health care decisions. Deborah testified to establish her biological relationship. David expressed his preference that Deborah be his guardian if such an appointment was necessary. The court thereafter appointed Deborah as temporary guardian, in accordance with preference under Texas law, subject to confirmation of her legal status as a sibling and until the anticipated final hearing.

At a later meeting between the respondent, Brault, Svetlana and Attorney Johnson, Brault indicated that David alleged in the past that Deborah conspired to steal from him. Brault further expressed "concern that [David's] current position favoring his sister as guardian was the product of his illness." Brault thereafter authorized Attorney Johnson to file a motion to remove Deborah as temporary guardian. Brault and Svetlana expressed their desire to have the respondent's continued counsel in the case. Attorney Johnson wrote to the respondent on June 12 expressing an interest in retaining him to provide certain " 'legal assistant' " services such as legal research, preparation of witnesses, and the preparation of legal documents. Attorney Johnson moved on June 13 to reconsider the decision appointing Deborah as guardian. The respondent participated in drafting this pleading. The court scheduled a hearing for July 10.

Attorney MacIntyre organized a meeting on July 10, the day of the hearing, to attempt to resolve the dispute over the proper temporary guardian. The respondent, Brault, and Attorneys Johnson, MacIntyre, Wyckoff and Hutchison all attended the meeting. They agreed to continue the hearing until a further meeting could be held with Brault and Deborah regarding a plan to have David move to Massachusetts to live with Deborah.

Subsequently, Deborah, Brault, the respondent and Attorneys MacIntyre, Wyckoff and Hutchison met. The respondent addressed whether a new guardianship proceeding would be required in Massachusetts and what expenses would be covered by the conservatorship. Brault

agreed to hold the motion to reconsider in abeyance, in consideration of Deborah's assurances that she would attend to David's needs in Massachusetts and pursue domestication of the Texas order on temporary guardianship in Massachusetts. Attorney Roy McCandless of Concord, New Hampshire, entered an appearance July 11 on behalf of David in the Carroll County Probate Court matters.

In August 2002, the respondent advised Brault that because David moved to Massachusetts and Deborah intended that he remain there, the New Hampshire guardianship was no longer necessary and should be withdrawn. Attorney McCandless assented to and the court approved the respondent's notice of withdrawal.

Attorney McCandless filed a motion for instructions in the Carroll County Probate Court confirming that David objected to the respondent's involvement as counsel for Brault due to a conflict of interest and arguing that David was entitled to independent counsel in regard to any aspect of the conservatorship, the guardianship matter, and his marital case. The respondent, at Brault's instruction, filed an objection on behalf of Brault and the conservatorship, noting that the New Hampshire guardianship proceeding had been withdrawn and asserting that David had no need for independent counsel except to review annual accountings and to provide representation in his divorce. The court scheduled a hearing on the matter for January 2003.

The Texas guardianship proceedings were dismissed January 21 pursuant to motions filed by Attorneys Wyckoff and Hutchison, to which Brault agreed. On January 28, the Carroll County Probate Court issued a scheduling order directing the parties to address the disqualification of the respondent from representing the conservatorship estate, among other issues.

The respondent and Attorney McCandless continued to dispute, through pleadings filed with the probate court, the conflict of interest issue and the propriety of his fees. On March 18, just prior to a scheduled hearing in the probate court, Brault and his attorney, David Azarian, appeared at the respondent's office and informed him that Brault had decided to resign as conservator. The respondent informed the court at the March 18 hearing that Brault had tendered his resignation and had authorized the respondent to withdraw as counsel for the estate. The court ultimately approved a stipulation regarding Brault's resignation, a transition period to a new conservator, the appointment of Deborah as the new conservator, and interim financial issues. Deborah, who was now the court-appointed conservator of David's estate, filed a sworn complaint in May 2003 against the respondent alleging professional misconduct. David subsequently adopted the accusations as his own complaint. Thereafter, the respondent

cooperated with the attorney discipline office (ADO) in developing a stipulated set of facts and exhibits. The ADO issued a notice of charges in October 2007 alleging violations of New Hampshire Rules of Professional Conduct (Conduct Rules) 1.7 (amended 2007), 1.9 (amended 2007) and 8.4(a) based upon the stipulated facts. The ADO amended the notice in November 2007, alleging a violation of Conduct Rule 1.5. (amended 2007). A hearing panel found that the respondent violated each Conduct Rule charged and recommended public censure as the appropriate sanction. The PCC heard oral argument in December 2008 and, in January 2009, accepted the stipulated facts, adopted the hearing panel's rulings, but directed disciplinary counsel to petition for disbarment. In its petition for disbarment, the PCC asserts violations of Conduct Rules 1.7, 1.9, 1.5 and 8.4(a). The respondent disputes each asserted violation.

We first consider whether the respondent violated the Conduct Rules. The PCC's findings of violations of the Conduct Rules must be supported by clear and convincing evidence. SUP. CT. R. 37A(III)(d)(2)(C). In attorney discipline matters, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction. *Young's Case*, 154 N.H. 359, 366 (2006).

█ We begin with a brief review of conservatorships. A person who deems himself unfit to prudently manage his affairs because of mental or physical disability may voluntarily apply for the appointment of a conservator. *See* RSA 464-A:13 (2004). "Conservators were originally called guardians and . . . a conservator has the same powers and obligations as a guardian in so far as they relate to the property of the ward." *Yeaton v. Skillings*, 103 N.H. 352, 354 (1961) (quotation omitted); *see* RSA 464-A:15 (2004). "A conservatorship differs from a guardianship in that it is voluntary rather than involuntary, is limited to the estate of the ward, and it is not necessary that the ward be mentally incompetent . . . ." *Filip v. Gagne*, 104 N.H. 14, 16 (1962).

## I. Concurrent Conflicts of Interest

The PCC alleges the respondent violated Conduct Rule 1.7(a) and (b). At all times relevant to this proceeding, Conduct Rule 1.7 provided:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation and with knowledge of the consequences.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation and with knowledge of the consequences. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

N.H. R. PROF. CONDUCT 1.7.

*A. Conduct Rule 1.7(b)*

In addition to representing David with respect to the conservatorship, the respondent concurrently represented Brault as conservator. *Cf. Vinson & Elkins v. Moran*, 946 S.W.2d 381, 402 (Tex. App. 1997) ("Generally, an attorney hired by the executors or trustees to advise them in administering the estate or trust represents the executors or trustees . . . ."). Brault contracted for the respondent's services and signed his name, as conservator, on the contract as the client. The respondent thereafter advised Brault concerning the operation of the conservatorship. The PCC contends that the respondent impermissibly represented David and Brault. We agree.

 A conflict exists under Conduct Rule 1.7(b) when the representation "may be materially limited" by duties owed to another client. This language is broad, *Boyle's Case*, 136 N.H. 21, 23 (1992), and focuses not upon direct adversity at the outset, but the risk that it or other material limitations may arise in the course of the dual representation. *See* N.H. R. PROF. CONDUCT 1.7 ABA Model Code Comments; 1 G. HAZARD, JR. & W. HODES, THE LAW OF LAWYERING § 10.4, at 10-12 (3d ed. 2007).

While Brault was charged with making certain decisions for the ward, *see Atlantic Restaurant Mgt. Corp. v. Munro*, 130 N.H. 460, 464 (1988), there existed at least some risk of adversity developing between him and David. *See* M. JASPER, GUARDIANSHIP, CONSERVATORSHIP AND THE LAW 1 (2008) ("An improperly conducted . . . conservatorship can result in fraud and

thievery, and can jeopardize the health and safety of the ward or conservatee, particularly when non-family members are appointed as . . . conservators."). Certain facts known to the respondent made the risk of adversity between David and Brault significant. The respondent had recently doubted Brault's ability to "deal with the complexities of managing [David's] affairs." The respondent assisted David in the past with his "relations with trustees." Furthermore, David was contractually compelled to enter the conservatorship as a condition of future support from his mother. Therefore, the respondent, before agreeing to represent Brault, should have foreseen that David might challenge the reasonableness of Brault's discretionary decisions, *see Morse v. Trentini*, 100 N.H. 153, 156 (1956), seek a new conservator, *see* RSA 464-A:15, :39, III (2004), or assert violations of Brault's fiduciary duties.

The respondent argues that no conflict could exist in view of the doctrine of primary and derivative clients. *See* G. HAZARD, JR. & W. HODES, *supra* § 2.7, at 2-11. Pursuant to that doctrine, a lawyer representing a fiduciary "must be deemed employed to further" the fiduciary's legally required service to the beneficiary; must ensure that truthful and complete information is passed along to the client by the fiduciary; and must "*disobey* instructions that would wrongfully harm the beneficiary." *Id.* at 2-11, 2-12. There is some support in our Conduct Rules for the doctrine's underlying principle. *See* N.H. R. PROF. CONDUCT 1.14 ABA Model Code Comments (2007) (amended 2007) (providing that lawyer representing guardian and aware that guardian acting adversely to ward's interest "may have an obligation to prevent or rectify the guardian's misconduct"). *But see State v. Decker*, 138 N.H. 432, 438 (1994) (noting that Conduct Rules "are aimed at policing the conduct of attorneys, not at creating substantive rights on behalf of third parties").

■ However, we have not adopted the primary-derivative client doctrine. We further note that the doctrine appears to rest largely upon cases imposing legal duties upon a lawyer as a basis for civil liability. *See* G. HAZARD, JR. & W. HODES, *supra* § 2.7, at 2-11 to 2-16. The Conduct Rules, however, were "designed to provide guidance to lawyers and . . . a structure for regulating conduct through disciplinary agencies . . . [,] not . . . [as] a basis for civil liability," N.H. R. PROF. CONDUCT Scope Commentary (repealed 2008). *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 380 (1994) ("The fact that the fiduciary client has obligations toward the beneficiaries does not impose parallel obligations on the lawyer, or otherwise expand or supersede the lawyer's responsibilities under the Model Rules of Professional Conduct.").

■ Furthermore, although the doctrine extends to beneficiaries some of the duties owed by the lawyer to the fiduciary-client, including some limited form of loyalty, *see* G. HAZARD, JR. & W. HODES, *supra* § 2.7, at 2-11, this does not create a direct attorney-client relationship with the beneficiary, *cf.*, *e.g.*, *In re Estate of Gory*, 570 So. 2d 1381, 1383 (Fla. Dist. Ct. App. 1990), and does not address competing loyalties where a lawyer represents *both* fiduciary and beneficiary. *See* 3 R. MALLEN & J. SMITH, LEGAL MALPRACTICE § 28:10, at 1267 (2009) ("Although in many respects the interests of the ward and conservator coincide, if they diverge, the conservator's attorney owes a duty only to the conservator."); *cf.* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 426 (2002) (discussing conflicts where lawyer serving as fiduciary concurrently represents beneficiary of an estate); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 135 comment *c* (2000) (same). The doctrine, therefore, does not relieve a lawyer undertaking dual representation of fiduciary and beneficiary from discussing with both clients future, material limitations that might occur and the effect of such limitations upon the attorney-client relationships, *see*, *e.g.*, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 comment *c(i)*.

■ Thus, the respondent violated Conduct Rule 1.7(b) because there is no evidence that he considered and reasonably concluded that the concurrent representation of Brault and David would not adversely affect either client, *see* N.H. R. PROF. CONDUCT 1.7(b)(1), or that the clients consented "after consultation and with knowledge of the consequences," N.H. R. PROF. CONDUCT 1.7(b)(2). Although at one point the respondent had "[a] lengthy discussion . . . about the potential for disagreements and discord between the two," the respondent did not expressly discuss conflicts of interest or their potential impact upon the attorney-client relationship.

### B. Conduct Rule 1.7(a)

"A lawyer shall not represent a client if the representation of that client will be directly adverse to another client . . . ." N.H. R. PROF. CONDUCT 1.7(a). The PCC asserts that representing Brault and Svetlana in the New Hampshire and Texas guardianship proceedings constituted a violation of Conduct Rule 1.7(a). We agree.

■ The respondent first disputes the finding that he represented Svetlana and Brault in the New Hampshire guardianship proceeding. "An attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *McCabe v. Arcidy*, 138 N.H. 20, 25 (1993) (quotation omitted).

■■ The stipulated facts and exhibits directly and inferentially support the finding that, by clear and convincing evidence, the respondent formed attorney-client relationships with Brault and Svetlana in pursuit of the New Hampshire guardianship. Consultation with the intent of seeking legal advice is the fundamental basis of the attorney-client relationship. *See id.* The manifestation of intent may be implied by surrounding circumstances or ratification of the attorney's actions. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 comment *c.* Brault consulted the respondent in late 2001 about guardianships and later accepted the respondent's counsel and continued assistance. Svetlana implicitly sought the respondent's assistance around the time of David's March 1 surgery by relating to the respondent her problems and concerns about David. She too later accepted the respondent's counsel and continued assistance. The respondent thereafter communicated advice in his capacity as a lawyer both before and after Brault and Svetlana hired Attorney Walker to initiate guardianship proceedings. The respondent also drafted affidavits accompanying the petition for guardianship and billed the conservatorship for each of these services. *See Bilodeau v. Antal,* 123 N.H. 39, 45 (1983) (stating that compensation may be evidence of practicing law in representative capacity). Indeed, the respondent confirmed the existence of the attorney-client relationships by advising David after service of the New Hampshire order to retain new counsel.

The respondent next argues that pursuing the guardianship was ethically permissible in light of Conduct Rule 1.14 (amended 2007) and Texas Rule of Professional Conduct 1.02(g). He conceded at oral argument that, unless permitted by these rules, representing Brault and Svetlana in the guardianship proceedings violated Conduct Rule 1.7(a).

At all times relevant to this action, Conduct Rule 1.14 provided:

> (a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client. The client's impairment shall also be considered in determining the adequacy of consultation.

> (b) A lawyer may seek the appointment of a guardian or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.

N.H. R. PROF. CONDUCT 1.14.

■ In light of the "absolute and unconditional" right to counsel in guardianship proceedings, RSA 464-A:6, I (2004), we have stressed that a lawyer acting under Conduct Rule 1.14 " 'shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.' " *In re Guardianship of Henderson*, 150 N.H. 349, 350 (2003) (quoting N.H. R. PROF. CONDUCT 1.14(a)). "This obligation implies that the lawyer should continue to treat the client with attention and respect, attempt to communicate and discuss relevant matters, and continue as far as reasonably possible to take action consistent with the client's directions and decisions." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 404 (1996). "[T]he principle of respecting the client's autonomy dictates that the action taken . . . should be the action that is reasonably viewed as the least restrictive action under the circumstances." *Id.*

■ The respondent's actions fell well outside the safe harbor of Conduct Rule 1.14. Although Conduct Rule 1.14(b) "clearly permits the lawyer himself to file a petition for guardianship upon concluding that it is necessary to protect the client and there are no less restrictive alternatives available[,] . . . nothing in the rule suggests that the lawyer may represent a third party in taking such action." *Id.* "[I]f the lawyer decides to file a guardianship petition, it must be on his own authority under Rule 1.14 and not on behalf of a third party, however well-intentioned." *Id.*

■ The respondent argues that he complied with Conduct Rule 1.14 because any direct adversity between clients became moot after the Carroll County Probate Court made a finding of incapacity before granting the temporary, limited guardianship over David's person. We acknowledge that there is some support for the contention that a finding of incapacity moots otherwise prohibited adversity. *See id.* (stating that representation of third parties in seeking guardianship over client is adverse and prohibited by Conduct Rule 1.7(a) "unless and until the court makes the necessary determination of incompetence"). Nevertheless, the respondent's argument fails because he cannot justify the means chosen — representing others in seeking a guardianship in New Hampshire — by the end result. *See id.* ("Even if the court's eventual determination of incompetence would moot the argument that the representation was prohibited by Rule 1.7(a), the lawyer cannot proceed on the assumption that the court will make such a determination.").

Furthermore, appointment of a temporary guardian does not "have the effect of an adjudication of incapacity." RSA 464-A:12, V (2004). Although the Carroll County Probate Court in fact made a specific finding of

incapacity, we question the efficacy of the *ex parte* finding in light of RSA 464-A:12, V and furthermore because it was entered after a hearing·at which the proposed ward, through the respondent's actions, was denied his statutory right to legal counsel, *see* RSA 464-A:6, I. *See* RSA 464-A:12, IV (2004) (providing additional requirements for appointment of temporary guardian when matter is contested); RESTATEMENT (SECOND) OF JUDG-MENTS § 72 (1982) (stating that judgment in a contested action may be avoided by person adjudicated incompetent if inadequately represented by counsel in the proceeding); *cf.* RESTATEMENT (SECOND) OF JUDGMENTS § 68(4) (stating that default judgment may be avoided by person adjudi-cated incompetent if "no representative was appointed to act for" him or her).

Next, the respondent mistakenly cites as justification for his actions Texas Rule of Professional Conduct 1.02, which provides, in relevant part:

> (g) A lawyer shall take reasonable action to secure the appoint-ment of a guardian or other legal representative for, or seek other protective orders with respect to, a client whenever the lawyer reasonably believes that the client lacks legal competence and that such action should be taken to protect the client.

Tex. Gov't Code Ann. tit. 2, subt. G, app. A, art. 10, § 9 (Vernon 2005). This rule is inapplicable to the respondent's actions because at all times relevant to the Texas court proceedings, Conduct Rule 8.5(b) provided, in relevant part:

> (b) *Choice of Law.* In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows:
>
> > (1) for conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice (either generally or for purposes of that pro-ceeding), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise; and
> >
> > (2) for any other conduct,
> >
> > > (i) if the lawyer is licensed to practice only in this jurisdiction, the rules to be applied shall be the rules of this jurisdiction, and
> > >
> > > (ii) if the lawyer is licensed to practice in this and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction

in which the lawyer principally practices; provided, however, that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct.

N.H. R. PROF. CONDUCT 8.5 (amended 2005, 2007).

■ Texas law does not apply under Conduct Rule 8.5(b)(1) because there is no evidence that the respondent was "admitted to practice" in Texas. He was denied admission *pro hac vice* and was not a member of the Texas bar during the relevant time period. Texas law similarly would not apply under Conduct Rule 8.5(b)(2) because the record indicates that, at the relevant times, the respondent was admitted to practice only in New Hampshire, *see* N.H. R. PROF. CONDUCT 8.5(b)(2)(i), and further suggests that his principal practice was in New Hampshire, *see* N.H. R. PROF. CONDUCT 8.5(b)(2)(ii).

## II. Successive Conflicts of Interest

■ The PCC alleges the respondent violated Conduct Rule 1.9. Conduct Rule 1.9 protects former clients by recognizing "the twin duties an attorney owes to a former client: [t]he duty to preserve confidences and the duty of loyalty." *Sullivan Cnty. Reg. Refuse Dist. v. Town of Acworth*, 141 N.H. 479, 483 (1996) (quotation omitted). At all relevant times, Conduct Rule 1.9 provided, in part:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation and with knowledge of the consequences.

N.H. R. PROF. CONDUCT 1.9(a). The PCC argues that the respondent breached Conduct Rule 1.9 after he concluded representing David by continuing to represent Brault in the Texas and New Hampshire guardianship matters and in connection with the disputed management of the conservatorship. We agree.

■ A violation of Conduct Rule 1.9 consists of four elements: a valid attorney-client relationship between the attorney and the former client; materially adverse interests between the former client and a present client;

representation of the present client in the same or a substantially related matter; and a lack of consent on the part of the former client. *See Sullivan Cnty. Reg. Refuse Dist.*, 141 N.H. at 481-82.

*A. The Guardianship Proceedings*

We will assume that the respondent ceased representing David on April 24, 2002. The respondent thereafter continued representing Brault with respect to the Texas and New Hampshire guardianship proceedings. The May 2002 effort to extend the temporary guardianship order was the same matter as the temporary guardianship ordered by the Carroll County Probate Court. The simultaneous effort to establish a permanent guardianship over David's person in New Hampshire was substantially related given the factual overlap between the two actions. Similarly, the guardianship proceedings in Texas were substantially related to the New Hampshire guardianship matters and the conservatorship itself because each concerned David's capacity and autonomy to make decisions. Representing Brault in each of these proceedings was materially adverse to David's interests because David opposed a guardianship over his person. *See* N.H. R. PROF. CONDUCT 1.9(a).

Because there is no evidence that David consented to the conflict after consultation and with knowledge of the consequences, the respondent violated Conduct Rule 1.9(a) by representing Brault in the New Hampshire and Texas guardianship proceedings after April 24, 2002.

*B. Management of the Conservatorship*

The respondent further violated Conduct Rule 1.9(a) by representing Brault against David's challenges to the management of the conservatorship and payment of certain expenses. This matter was the same and/or substantially related to the earlier conservatorship matters. David's interests were materially adverse to Brault's because he was alleging misconduct on the conservator's part. While the respondent argues that there was no true adversity until March 18, 2003 (the date Brault resigned as conservator), he should have detected the adversity as early as August 2002, when Attorney McCandless detailed concerns about payment of certain legal and medical expenses by the conservatorship and the respondent's conflict of interest. Because there is no evidence that David consented to the conflict, *see id.*, the respondent violated Conduct Rule 1.9(a).

*III. Illegal Fees*

The PCC alleges the respondent violated Conduct Rule 1.5(a), by charging "illegal fees" because his fees were "generated during the period

of time when [he] was acting in violation of Rules 1.7 and 1.9." The PCC briefly mentioned this violation at oral argument, citing *In re Estate of McCool*, 131 N.H. 340 (1988). However, in its brief the PCC makes only passing reference to the alleged violation of Conduct Rule 1.5 without any analysis or argument. We therefore consider it waived. *See In re Estate of Leonard*, 128 N.H. 407, 409 (1986).

*IV. Conduct Rule 8.4(a)*

■ Conduct Rule 8.4(a) prohibits lawyers from "violat[ing] or attempt-[ing] to violate the Rules of Professional Conduct." N.H. R. PROF. CONDUCT 8.4(a). By violating Conduct Rules 1.7(a), 1.7(b), and 1.9(a), the respondent also violated Conduct Rule 8.4(a).

*V. Sanction*

■ Having concluded that the respondent violated the Conduct Rules, we turn to the sanction.

> We retain the ultimate authority to determine the appropriate sanction for a violation of the rules governing attorney conduct. When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future.

*Conner's Case*, 158 N.H. at 303 (citation omitted).

■ "In deciding the appropriate sanction, we consider the case on its own facts and circumstances." *Id.* (quotation omitted). Where there exist multiple misconduct charges, "the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct." *Id.* We look to the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (Standards) for guidance. *Id.* Under the Standards, we consider: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *Id.* (quotation omitted).

We first consider the duty violated. By violating Conduct Rules 1.7 and 1.9, the respondent continuously violated his duties of loyalty to multiple clients over a period of almost two years. We have described the duty of loyalty as a "bedrock dut[y] of the legal profession." *Id.* These conflicts of interest were, as the PCC characterized them, "open and obvious."

Next, we review the respondent's mental state at the time of the violations. The respondent's mental state may be one of intent, knowledge, or negligence. *Id.* at 304. "What is relevant . . . is the volitional nature of the respondent's acts, and not the external pressures that could potentially have hindered his judgment." *Grew's Case*, 156 N.H. 361, 366 (2007). Given the length of time during which the respondent operated under various conflicting interests, and the fact that at least twice these ethical concerns were raised in motions for disqualification, we agree with the PCC that the respondent's behavior was, at a minimum, knowing.

We next consider the actual and/or potential injury visited by the respondent's misconduct. By operating under a conflict of interest at the inception of the conservatorship, the respondent exposed the estate to potential double-dealing, and put at risk the conservatorship, the contract with David's mother, and the funding of David's trusts. In addition to causing David distress, the respondent's misconduct, coupled with his denial thereof, had the effect of denying David legal representation in the New Hampshire guardianship proceedings. *See Henderson*, 150 N.H. at 351 ("In a guardianship proceeding, the proposed ward is entitled to counsel who will undertake representation of his or her legal interests."). The potential for injury in such a denial is reflected within the statutory mandate that all proposed wards have an "absolute and unconditional" right to legal counsel. RSA 464-A:6, I. The proposed ward "needs an advocate to make sure the court hears his or her wishes and preferences, that his or her due process rights are respected, and that he or she retains as much dignity and autonomy as possible." J. HYMAN, ELDER LAW AND FINANCIAL STRATEGIES: PLANNING FOR LATER IN LIFE § 8.02[5], at 8-23 (2009).

Considering the duty violated, the respondent's mental state, and the harm and potential harm caused, we conclude, as did the PCC, that the appropriate baseline sanction is disbarment. The Standards provide for disbarment where a lawyer:

 (b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client; or

 (c) represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.

STANDARDS, *supra* § 4.31. In violating Conduct Rules 1.7(a) and 1.9, the respondent undertook and persisted in representations which he knew or should have known were improper. Other attorneys twice pointed out the conflicts of interest. Furthermore, the respondent persisted in rendering legal advice during the Texas proceeding despite a court order denying his admission *pro hac vice*. The injuries caused can only be characterized as serious and/or potentially serious. Finally, the respondent intended to benefit Brault by steadfastly defending Brault's conduct against David's challenges to the legal fees and the June 2002 accounting. The respondent also intended to benefit Svetlana by advancing her attempt to gain greater control over David at a time when the respondent suspected that she harbored ulterior motives. Accordingly, we agree with the PCC that the respondent's misconduct in connection with the conflicts of interest rises above that warranting merely suspension, a sanction appropriate "when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client," *id.* § 4.32.

We next consider the effect of aggravating and mitigating factors upon the baseline sanction of disbarment. The PCC identified the following aggravating factors: selfish motive due to the large amount of fees garnered; a pattern of misconduct; refusal to acknowledge the wrongful nature of his conduct; his substantial experience; his lack of restitution or any effort to return fees; and David's vulnerability. We acknowledge his substantial experience, his pattern of misconduct and multiple violations, his refusal to acknowledge the wrongful nature of his conduct, and, most importantly in this case, David's vulnerability to overreaching. *See id.* § 9.22.

We agree with the PCC that the respondent's lack of disciplinary record and his excellent reputation among judges and practicing attorneys mitigate his misconduct. Furthermore, at oral argument the respondent apologized to the court, David, the PCC and the bar and, although he disputed the findings of misconduct, he recognized that reaching this point in the disciplinary process evidenced some fundamental failure on his part. *See id.* § 9.32(l) (identifying remorse as mitigating factor). Additionally, although "a lawyer has a professional duty to cooperate with the committee's investigation," *Richmond's Case*, 152 N.H. 155, 161 (2005), we accord mitigating weight to the respondent's "full and free disclosure to [the] disciplinary board . . . [and his] cooperative attitude toward [the] proceedings." *Id.* § 9.32(e). We also attach significant mitigating weight to the delay in these proceedings. The PCC explained at oral argument that the delay was due, in part, to a backlog. While we have previously rejected delay as

a mitigating factor, *see Douglas' Case*, 156 N.H. 613, 621-22 (2007), the delay here was not caused by the respondent and, if anything, was minimized by his cooperative attitude. *See generally* Annotation, *Attorneys at Law: Delay in Prosecution of Disciplinary Proceeding as Defense or Mitigating Circumstance*, 93 A.L.R.3D 1057 § 18 (1979 & Supp. 2009) (collecting cases where delay considered mitigating).

Taking into consideration all of these circumstances, we conclude that suspension is the appropriate sanction. We typically impose disbarment pursuant to the Standards where conflicted attorneys act pursuant to some selfish or improper motive. *See Conner's Case*, 158 N.H. at 304 (avoiding malpractice claim); *Wolterbeek's Case*, 152 N.H. 710, 717 (2005) (financial gain); *Coffey's Case*, 152 N.H. 503, 513-14 (2005) (excessive fees and acquisition of property for less than market value). While the respondent improperly favored Brault's and Svetlana's interests, the reasonableness of the respondent's fear for David's welfare was never questioned in these proceedings and mitigates much, though not all, of his misconduct. Imposing the ultimate sanction of disbarment under these circumstances might discourage appropriate action pursuant to Conduct Rule 1.14. On the other hand, public censure, the sanction recommended by the hearing panel and urged by the respondent, is insufficient to protect the public and preserve the integrity of the legal profession. *See Shillen's Case*, 149 N.H. 132, 140 (2003) (ordering public censure where conflicted attorney acted negligently). The respondent's continuous and knowing violations of his duties of loyalty warrant a greater sanction. Therefore, we order the respondent suspended for two years. Three years is the maximum period of suspension under the Standards, thus communicating to the bar and the public the primacy of the duty of loyalty and the sanctity of client autonomy. The suspension begins upon the date this order becomes final. We further order the respondent to reimburse the committee for its expenses in investigating and prosecuting this matter. *See* SUP. CT. R. 37(19)(a).

*So ordered.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.