Professional Conduct Committee
No. LD-2010-012

BRUZGA'S CASE

Argued: March 17, 2011
Opinion Issued: May 12, 2011

54

*James L. Kruse*, assistant disciplinary counsel, of Concord, on the brief and orally, for the professional conduct committee.

*David Horan*, of Manchester, by brief and orally, for the respondent.

DUGGAN, J. The respondent, Paul W. Bruzga, appeals an order of the Supreme Court Professional Conduct Committee (PCC) suspending him from the practice of law for six months. We order that Bruzga be suspended for six months.

The record and the PCC's findings support the following facts. The violations at issue arise from Bruzga's representation of an incapacitated client, George Doherty, while also advising Doherty's brother, who served as Doherty's guardian and trustee of Doherty's special needs trust.

In April 2005, Steven Doherty (the brother) filed a petition in Hillsborough County Probate Court seeking appointment of himself as guardian for Doherty, who had suffered serious head trauma that left him legally incapacitated. Doherty's sister objected to the brother's appointment, but the court appointed him temporary guardian and scheduled a hearing to determine permanent guardianship. The court appointed Bruzga to represent Doherty's interests in the guardianship proceeding. Around this time, the brother first spoke to Bruzga and told him that he had applied for Medicaid benefits on Doherty's behalf.

Because an individual typically must exhaust his personal funds prior to becoming eligible for Medicaid, Bruzga recommended the creation of a special needs trust (SNT), which protects an individual's assets without jeopardizing Medicaid eligibility. However, as a matter of law, the SNT must contain a clause providing that any assets remaining at the time of the recipient's death be repaid to Medicaid to offset the cost of benefits received.

Bruzga then drafted the SNT for the brother, who was named trustee. The PCC found that after drafting the SNT, Bruzga continued to provide advice and counsel to the brother and billed him on a monthly basis. Additionally, around this time, Bruzga and an attorney for the sister negotiated the final terms of a stipulation granting the brother guardianship over Doherty. Bruzga purported to act only as an intermediary between the sister's attorney and the brother and emphasized to the brother in a letter dated June 27, 2005, that he did not represent him. However, he signed the stipulation as "Attorney for Steven Doherty."

Doherty passed away in September 2005. Following Doherty's death, Bruzga advised the brother regarding the disbursement of the SNT. Bruzga knew that Doherty had received Medicaid benefits and also knew of the Medicaid repayment obligation. Nonetheless, neither Bruzga nor the brother ever notified Medicaid of the existence of the SNT or of Doherty's death. The brother testified that he attempted to notify Medicaid of Doherty's death through Doherty's nursing home, but never received a bill or other correspondence from Medicaid. Bruzga advised the brother that if he did not receive a bill, he could distribute the SNT assets to himself and the sister.

Several months passed and Medicaid did not seek reimbursement. Bruzga then helped the brother complete the final accounting for the SNT, which made no provision for Medicaid repayment. All disbursements, including payments to the brother and sister and attorney's fees were completed by June 27, 2006. A few days prior to these distributions, the New Hampshire Attorney General's Medicaid Fraud Unit (Medicaid Fraud Unit) had written to the brother and contacted Bruzga requesting records pertaining to Doherty's Medicaid benefits and an accounting of disbursements from the SNT. The brother conferred with Bruzga regarding this inquiry. Bruzga contacted the Medicaid Fraud Unit's Chief Investigator (the investigator) and left him a voicemail on June 21.

The investigator responded by letter dated July 13, which confirmed an earlier request for a copy of the SNT's most recent accounting and expressed concern that Doherty had received Medicaid benefits without disclosing the SNT. Bruzga called the investigator the next day and told him that all funds from the SNT had been disbursed and that he was

unaware of any bill or claim by the State for Medicaid reimbursement. He then continued to communicate with the investigator on behalf of the brother. Despite his knowledge regarding the State's ongoing investigation, Bruzga completed preparation of the final accounting for the SNT and filed it with the probate court on July 21. He subsequently billed the brother for legal services associated with the trustee accounting and disbursements from the SNT and communications with the investigator.

In August 2006, the sister filed an objection to the accounting, claiming that the brother had breached his fiduciary duty as trustee of the SNT and that Bruzga had received excessive fees. After the brother consulted with Bruzga about these issues, Bruzga filed an answer defending his own conduct. The brother did not file his own answer. Bruzga, in his answer, acknowledged that at the brother's request and with the permission of the court, he had prepared the final accounting.

Following a September hearing, the probate court issued an order that requested "an explanation as to why the State of New Hampshire, or any other public benefit authority, that may have provided any benefits to the beneficiary of the trust, George Doherty, was not reimburse [sic] for any such benefits, before final distribution of the trust estate." The brother then conferred with Bruzga regarding documents he needed to supply to the court and the investigator. Bruzga billed the brother for this advice. Based upon the advice he received from Bruzga, the brother represented to the court that the assets could be distributed because the Medicaid office had not contacted the brother. On October 17, the court conditionally approved the trustee accounting and accepted the brother's explanation regarding his failure to reimburse Medicaid.

Bruzga formally withdrew as Doherty's counsel on October 5, but continued to advise the brother regarding the probate court proceedings and the Medicaid Fraud Unit's investigation. He later sent an invoice to the brother, dated March 5, 2007, which included more than seventeen billable hours.

In November 2006, the Medicaid Fraud Unit formally demanded repayment from the brother and sister because the distributions they received from the SNT violated federal and state law. Bruzga reviewed this correspondence and billed the brother for his services. In December, the sister filed a motion to re-open Doherty's probate estate and impose sanctions against Bruzga and the brother. Bruzga again conferred with and billed the brother, but they both filed their own responsive pleadings. In his answer, Bruzga claimed that "[t]he Final Accounting information was provided by [the brother] and merely typed by . . . Bruzga."

Finally, in January 2007, the State filed a motion to re-open the trustee accounting, demanded Medicaid reimbursement and requested court re-

view of Bruzga's and the brother's conduct. Bruzga conferred with and billed the brother, but they again filed their own responsive pleadings. The probate court subsequently held a structuring conference and ordered the State and the sister to file a summary of the proceedings in the case and the brother and Bruzga to file their responses. While Bruzga did not represent the brother at this conference, he also made no mention to the court of his potential conflict of interest. Bruzga filed his response in July and claimed that he only "type[d] [the brother's] numbers onto forms for the Court." Additionally, he sought leave to withdraw from the case. The brother and sister ultimately resolved the State's claim for reimbursement through mediation.

In June 2007, the sister filed a grievance concerning Bruzga's conduct with the Attorney Discipline Office (ADO). The ADO issued a notice of charges in May 2009, alleging violations of New Hampshire Rules of Professional Conduct (Rules) 1.1(a)-(c), 1.5(a), 1.7(b), 1.9(a), and 8.4(a). The ADO filed an amended notice of charges in August 2009, which omitted the alleged violation of Rule 1.9(a) and revised the factual allegations regarding the violation of Rule 1.7(b). The charges were heard by the PCC's Hearing Panel (Hearing Panel) in October 2009, which found by clear and convincing evidence that Bruzga violated Rules 1.1(a)-(c), 1.7(b), and 1.5(a), and recommended a six-month suspension. In July 2010, the PCC adopted the Hearing Panel's recommendation and also found that he violated Rule 8.4(a). Bruzga appealed.

█ Because the parties do not argue for a different review standard in this appeal from a decision of the PCC, *see* SUP. CT. R. 37(16)(g), than we apply when considering a petition for sanctions filed by the PCC, *see* SUP. CT. R. 37(16)(e), we will assume, without deciding, that our usual standard of review applies. In attorney discipline matters, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the sanction. *Wyatt's Case*, 159 N.H. 285, 297 (2009). The PCC's findings of violations of the Rules must be supported by clear and convincing evidence. SUP. CT. R. 37A(III)(d)(2)(C).

## I

We first consider whether Bruzga violated the Rules. Bruzga does not contest that he violated Rules 1.1(a)-(c) (competence) and 8.4(a) (misconduct), and therefore we need only consider whether he violated Rules 1.7(b) and 1.5(a).

At the relevant time, Rule 1.7(b) provided that:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation and with knowledge of the consequences.

N.H. R. PROF. CONDUCT 1.7(b) (amended 2007).

Bruzga first disputes that he represented the brother at all. We note that the PCC did not find that Bruzga violated Rule 1.7(b) by concurrently representing the brother, as trustee, and Doherty. The sole issue before us is whether Bruzga violated Rule 1.7(b) by representing the brother while they were both subjects of a Medicaid Fraud Unit probe. Accordingly, our inquiry focuses primarily upon Bruzga's relationship with the brother during the period of time after the Medicaid Fraud Unit first contacted them.

■ "An attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Wyatt's Case*, 159 N.H. at 300 (quotation omitted).

■ The record supports the finding that Bruzga formed an attorney-client relationship with the brother. "Consultation with the intent of seeking legal advice is the fundamental basis of the attorney-client relationship." *Id.* at 301. "The manifestation of intent may be implied by surrounding circumstances or ratification of the attorney's actions." *Id.* In this case, the brother sought and received advice from Bruzga on numerous occasions, both before and after the Medicaid Fraud Unit launched its investigation.

In May 2005 Bruzga first suggested creating a SNT for Doherty's benefit. Over the course of the next two years, the brother solicited, received and was billed for advice from Bruzga regarding a variety of matters, including the stipulation granting the brother guardianship over Doherty, the sister's complaint about the brother's performance as trustee and the winding up of Doherty's affairs and disbursement of his assets.

Additionally, the brother continued to rely upon Bruzga for advice when the Medicaid Fraud Unit began its investigation in June 2006. From that

point forward, the brother consulted with Bruzga numerous times regarding the failure to reimburse the State for Doherty's Medicaid benefits. For example, Bruzga billed the brother for services provided in September 2006, when the probate court requested an explanation regarding why the brother had not reimbursed the State for Doherty's Medicaid benefits; in November 2006, when the Medicaid Fraud Unit sent the brother correspondence demanding payment toward Doherty's Medicaid benefits; in December 2006, when the sister filed a motion to re-open Doherty's probate estate; and in January 2007, when the State filed a "Motion to Reopen Trustee's Accounting" and demanded Medicaid reimbursement. Moreover, despite formally withdrawing as Doherty's counsel on October 5, 2006, Bruzga continued to bill the brother for "Special Needs Trust Issues" from October 6, 2006 through March 5, 2007, and did not request leave to withdraw from the case entirely until July 25, 2007. *See Bilodeau v. Antal*, 123 N.H. 39, 45 (1983) (stating that compensation may be evidence of practicing law in representative capacity).

The brother's testimony confirms that he relied upon Bruzga for legal advice throughout the probate court proceedings and through most of the Medicaid Fraud Unit's investigation. The brother testified that he "relied on [Bruzga's] expertise in everything," that he "used [Bruzga] as much as [he] could as for legal advice, and [that he] relied on his information," and that, after Doherty died, Bruzga told him, "I will stay to the end, and I won't let you go alone through the trial." He also testified that he relied upon Bruzga for advice in responding to the Medicaid Fraud Unit. While the brother also testified that Bruzga repeatedly told him that he was not his attorney, this testimony referred only to the time period after December 2006, during which the brother felt "hung out to dry" because Bruzga "denied everything."

Furthermore, to the extent that Bruzga argues that he merely acted as a "go-between" between the brother and sister or as a "scribe" to assist the brother with filling out court-related paperwork, we agree with the PCC that Bruzga's conduct "belied that assertion." Accordingly, we conclude, as did the PCC, that "any reasonable recipient of [the] [r]espondent's advice would have assumed an attorney-client relationship." (Quotation omitted.)

Bruzga next contends that providing some advice .and counsel to the brother throughout the guardianship proceeding was permissible in light of Rule 1.14, which at the time provided that:

> (a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability, or for some other reason, the lawyer shall, as far as reasonably possible, maintain a

normal client-lawyer relationship with the client. The client's impairment shall also be considered in determining the adequacy of consultation.

(b) A lawyer may seek the appointment of a guardian or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.

N.H. R. PROF. CONDUCT 1.14 (amended 2007).

■ Bruzga is incorrect in his assertion that Rule 1.14 applies to this case. The charged violation of Rule 1.7(b) related to his conduct following Doherty's death and his withdrawal as Doherty's counsel. Following Doherty's death, any shared interests between Bruzga, as Doherty's counsel, and the brother, as Doherty's guardian, dissipated and Rule 1.14 does not shield Bruzga from an ethical violation. Therefore, we conclude that representing the brother during the course of the Medicaid Fraud Unit's investigation was a conflict of interest that violated Rule 1.7(b) because both Bruzga and the brother were subjects of that investigation.

## II

■ The PCC determined that Bruzga violated Rule 1.5(a) by charging the brother for legal services after a conflict of interest arose in July 2006. Bruzga acknowledges in his brief that whether he violated Rule 1.5(a) "rises or falls on the PCC decision as to whether or not the Hearing Panel could reasonably conclude that [he] had knowingly violated Rule 1.7(b)." Having concluded that Bruzga violated Rule 1.7(b), we also conclude that he violated Rule 1.5(a) because he continued to charge the brother legal fees long after the conflict of interest arose.

■ As noted above, Bruzga does not challenge the PCC's determination that he violated Rule 1.1(a)-(c). We agree that he violated Rule 1.1(a)-(c) because he breached the duty of competence by advising the brother that he could disburse the remaining SNT assets without reimbursing Medicaid. We note that the ADO did not charge Bruzga with a violation of Rule 1.2(d) (counseling a client to engage in "criminal or fraudulent" conduct).

## III

■ Having concluded that Bruzga violated the Rules, we turn to the sanction. We retain the ultimate authority to determine the sanction for a violation of the rules governing attorney conduct. *Wyatt's Case*, 159 N.H. at 306.

■ "In deciding the appropriate sanction, we consider the case on its own facts and circumstances." *Id.* (quotation omitted). We look to the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS) for guidance. *Id.* Under the STANDARDS, we consider: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *Id.*

We first consider Bruzga's breach of the duty of competence because we consider it to be his most serious violation. Bruzga failed to give competent legal advice in violation of Rule 1.1(a)-(c) by failing to advise the brother that he needed to reimburse Medicaid prior to disbursing Doherty's SNT. Not only did Bruzga fail to advise the brother of the repayment requirement, but he affirmatively told the brother to disburse the corpus of the SNT without first contacting Medicaid.

■ We next review Bruzga's mental state at the time of the violation. The mental state may be one of intent, knowledge, or negligence. *Conner's Case*, 158 N.H. 299, 304 (2009). "What is relevant is the volitional nature of [Bruzga's] acts, and not the external pressures that could potentially have hindered his judgment." *Id.* (quotation and ellipsis omitted). We agree with the PCC that Bruzga knowingly violated the Rule because he knew that the SNT was required to reimburse Medicaid for benefits received by Doherty and was aware of the State's claim for reimbursement before he filed the trustee accounting. Bruzga competently prepared the SNT and included the required clause regarding Medicaid reimbursement. Nonetheless, despite his knowledge that Doherty received Medicaid benefits and that the State was entitled to reimbursement for those benefits, Bruzga inexplicably advised the brother to disburse the SNT's assets.

■ Next, we review the actual or potential injury caused by Bruzga's conduct. "The STANDARDS define 'injury' as 'harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct.' " *Id.* (quotation omitted). Bruzga contends that his actions did not harm the brother because the brother and sister were both paid money that they never should have received. Contrary to Bruzga's narrow view of his actions, we agree with the PCC that Bruzga caused the brother to violate the terms of the SNT, breach his fiduciary duty, break the law, and become the subject of a criminal probe. Thus, Bruzga's conduct inflicted injury upon the brother.

■ Reviewing these factors, we conclude the baseline sanction to be suspension. Suspension is appropriate for a breach of the duty of competence "when a lawyer engages in an area of practice in which the lawyer

knows he or she is not competent, and causes injury or potential injury to a client." STANDARDS, *supra* § 4.52. Public censure is appropriate if a lawyer:

 (a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

 (b) is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client.

*Id.* § 4.53.

Bruzga contends that public censure is the baseline sanction for his breach. We acknowledge that Bruzga's course of conduct does not fit neatly into any of the proposed sanctions under the STANDARDS. However, having concluded that he knowingly breached the duty of competence, it is clear that his actions go beyond a mere "failure to understand relevant legal doctrines." Bruzga understood the duty of an SNT trustee to reimburse Medicaid, yet knowingly advised the brother to ignore the requirement. In fact, Bruzga's conduct was arguably more reprehensible than that required for a suspension because he was undoubtedly competent to handle matters related to an SNT, but still knowingly rendered incompetent advice. Accordingly, taking into consideration the purpose of attorney discipline and the guidelines for punishment set out by the STANDARDS, we conclude that the baseline sanction for Bruzga's breach of the duty of competence is suspension. *See Coffey's Case*, 152 N.H. 503, 513 (2005) (describing the purpose of attorney discipline as protecting the public, maintaining public confidence in the bar, preserving the legal profession, and preventing similar conduct in the future); *Wyatt's Case*, 159 N.H. at 306 (explaining that we look to the STANDARDS for *guidance*).

Because we conclude that Bruzga's most serious offense warrants a baseline sanction of suspension, we need not consider the baseline sanctions for his violations of Rules 1.5(a) and 1.7(b). However, we take these violations into account in determining the actual sanction to be imposed. *See Wyatt's Case*, 159 N.H. at 306 (explaining that in the case of multiple misconduct charges, "the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct" (quotation omitted)).

We next consider the effect of aggravating and mitigating factors upon the baseline sanction of suspension. The PCC identified the following aggravating factors: Bruzga's prior disciplinary record, which includes a

one-year suspension in 2000, a warning in 2006, and a six-month suspension stayed for one year with conditions in 2010, his refusal to acknowledge his wrongful conduct, and his substantial experience practicing law. *See* STANDARDS, *supra* § 9.22 (a), (g), (i).

Bruzga disputes the PCC's application of his prior disciplinary record and his refusal to acknowledge his wrongful conduct as aggravating factors. Although the facts underlying Bruzga's 2000 suspension occurred in 1993, we agree with the PCC that his prior offense is relevant to the present conduct because Bruzga again showed a "lack of candor and disingenuousness to the point of misrepresentation." *See Bruzga's Case*, 145 N.H. 62, 71 (2000) (noting that Bruzga "engaged in semantical word play" to explain his actions during his discipline hearing). Additionally, while Bruzga was certainly entitled to contest the allegations against him, he has repeatedly sought to minimize his conduct by characterizing his relationship with the brother merely as that of a "go-between" or "scribe."

Thus, we agree with the PCC's application of these aggravating factors. Bruzga continues to exhibit many of the same behaviors that troubled us in 2000 by refusing to accept any responsibility for his wrongful conduct. Moreover, not only has Bruzga engaged in a pattern of misconduct, resulting in four disciplinary proceedings against him since 2000, but he also committed multiple offenses with respect to the current disciplinary proceeding. *See Wyatt's Case*, 159 N.H. at 306 (in the case of multiple violations, the discipline imposed "might well be and generally should be greater than the sanction for the most serious misconduct" (quotation omitted)).

■ The PCC did not find any mitigating factors. Bruzga urges us to consider the absence of any dishonest or selfish motive, the delay in his disciplinary proceedings, and his cooperative attitude throughout the proceedings. *See* STANDARDS, *supra* § 9.32 (b), (e), (j). Even taking these mitigating factors into account, we cannot ignore the totality of Bruzga's conduct and his continued refusal to accept any responsibility for his actions. As we noted with regard to his 2000 suspension, his actions again "raise[] a question as to the likelihood that he would modify his conduct in the future." *Bruzga's Case*, 145 N.H. at 72. Accordingly, we conclude, as did the PCC, that the proper sanction is a six-month suspension. The suspension begins upon the date that this order becomes final. We further order Bruzga to reimburse the committee for its expenses in investigating and prosecuting this matter, *see* SUP. CT. R. 37(19)(a), and to comply with all other requirements in connection with his suspension as ordered by the PCC.

*So ordered.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.